Edie Cunningham, on behalf of Appellant Smith, I would like to try to reserve three minutes for rebuttal. The circumstances here strongly supported duress. The co-defendant was a longtime abuser of children and a convicted felon for strangling his ex-wife. Within weeks of meeting Smith, he charmed his way into her life and moved in with her. And he brought guns and knives into her home and threatened grave harm to her and her children if she did not do what he asked. She had several opportunities to alert the authorities that there was a problem there, and she did not do it at all, ever. And what she did was abhorrent. Whether she loved this guy or not, she had the opportunity to alert the authorities that there were bad things going on. Now, explain why she didn't tell anybody about it. Your Honor, I'd like to discuss the issues that we've raised in the brief. That is an issue for the jury. I'd like you to answer my question first. Well, she didn't because the co-defendant brought several firearms into the home, a knife called the Heart Ripper. He threatened to kill her and her kids if she didn't do it. He threatened to break her little girl's fingers. He had locks on the tops of the bedroom doors to control her movements. So there were a lot of reasons why she was under an imminent threat. And all of the errors in this case struck right at the heart of her defense. They require reversal, either alone or in combination. All were part of the government's improper appeal to the jury to take our word for it. She was a willing participant. I'll first start with the hearsay issue, unless the court would prefer me to start with another issue. The out-of-court statement at issue here was the Tahlequah police officer's statement in the police report that Smith called the police to her home in December of 21 to report a stolen vehicle. The witness who testified about it, Agent Kurt, only knew about it because she read about it in a police report. A police report is beyond dispute hearsay under the rules of evidence. And the government weaponized the truth of this purported statement to the police in its closing argument when it argued if Smith was outraged enough to call the police about a stolen vehicle, she could have called the police about her daughters. It was prejudicial. It was used in rebuttal closing argument, which is especially prejudicial, and it went straight to her duress defense. The government never offered any reasonable explanation as to why this was not hearsay, either at trial or on appeal. If there are no questions on that, I will move on to the opinion testimony. We maintain that this error was preserved. The defendant made a preliminary objection before Agent Jackson testified about the videos, that the videos should speak for themselves and there shouldn't be inappropriate comments about them. The district court ruled the witness can testify or comment on evidence that is admitted to the jury. So there wasn't a need to take exception to this ruling. And then again, when the prosecutor first questioned Agent Jackson about Smith's demeanor on the videos. In addition to this objection, the defense counsel said this is foundation and speculation, which further alerted the court to the problem, but it was overruled. And as this court has said recently in the DA case, counsel need not use magic words or expressly invoke a rule in order to preserve an issue for appeal. But in any event, this was plain error. This testimony about Smith's demeanor in the videos was not helpful to the jury. As noted, the videos were ultimately admitted through Anthony Meaner. They were very short videos, the longest of which was three or four minutes long. There was absolutely no reason why the agent's opinion about my client's demeanor in the videos was helpful to the jury. The plain language of the rule, rule 701, makes clear that this was not appropriate testimony. The advisory committee notes to rule 701 makes clear that when opinion testimony amounts to little more than choosing up sides, it is in violation of the rule. This court in Brooks and Goodman have made it abundantly clear that when a witness is in no better position than the jury to render an opinion, that it is not helpful under 701. And it is hard to think of a better example of opinion testimony that violates rule 701B. And it was especially bad because it was a form of overview evidence. Overview evidence typically happens in conspiracy cases, but here we had Agent Jackson who was testifying about the videos before they were admitted into evidence. They were admitted into evidence a couple of witnesses later through Anthony Meaner. And what essentially she did, and then Agent Kurt did in her redirect before the videos were published to the jury, was implant the government's theory of the case into the jury's mind before they even had a chance to view the videos. They were spoon feeding the prosecutor's theory to the jury and in essence, acting as deputy prosecutors to argue the case when the only proper place to make arguments like is in closing argument. And it could have had, and likely did have a very real impact on my client's defense because if the juries hadn't been poisoned in that way by this improper opinion, they may well have looked at the videos and said, well, she's, you know, Smith is doing everything she can to make sure that this guy is going to be satisfied with what she's doing so that her kid's fingers aren't broken or they're not all killed. But the prosecutor's improper opinion allowed, basically implanted the prosecutor's theory into the jury's mind. And frankly- What was the jury instructed about duress and what you were required to show? They were given the standard duress instruction that the defendant was under an unlawful and imminent and impending threat, which would induce a well-grounded apprehension of death or serious bodily injury. And she had no reasonable legal alternative to violating the law and needed to do it to avoid the threatened harm. Yeah. And these, these counts, basically the various counts, which she was convicted, there were nine counts that occurred over a period of four days, right? Some of the, some of the videos were on Sunday, November 21st, and some of them I believe were on Wednesday, November 24th. Thanksgiving was that, 2021, I think Thanksgiving was that Thursday. So there was three days, at least three full days, basically in between the two sets of videos. And yet her claim was that she was under this imminent threat, apparently this entire time, right? I mean, she doesn't, she's got three days in there. If she was really under this imminent threat to do these horrible, horrible things with her children on Sunday, and we've got video of that. So the jury could observe whether they thought she was under threat, imminent threat. What, what about Monday and the rest of Sunday and Monday and Tuesday and Wednesday? Well, your honor, if somebody has knives and guns in the home and they're pointing them at you and they're saying, look, if you don't do this. What evidence was there that this was happening that entire period? No, no opportunity, no opportunity to do anything about it legally, to go to law enforcement. What evidence was there about that period? I'm not, I'm not saying there wasn't evidence that she said, oh, I was under duress, but all we have is some very generalized statements, not about when or how long or how long, if she was held at, was she held at knife point? Was she held at gunpoint? Was she, was she allowed to leave, not allowed to leave the house? Were the children not allowed to leave? We don't know any of that. We don't know the immediacy of it, the length of it. We don't know if she, we don't know whether she had no time in that whole time period or even after to go to law enforcement, the two months after she's taken to daycare. What evidence of duress, what evidence of a continuing imminent duress do we have, even for the three-day period that she, this, this occurred on? Well, your honor, for one thing, the district court found that there was sufficient evidence of duress and gave the jury the instruction. I understand that, but when we're being asked to do, you're, we're going to have to do a prejudice analysis here, if you're correct, that there were errors, potentially more than one error. And I'm just saying the fact that there's an instruction doesn't, isn't going to be enough for you. Well, your honor, I would just say that if you're living with an abusive monster, like my client was, who has guns and knives and a heart who has strangled his ex-wife and basically has lied. She didn't know that. And she apparently didn't know that. She believed that he had, she believed he was previously a law enforcement officer. She apparently believed some things that he told her at the time. She was not aware of these things. Well, she was aware he had choked someone and she was aware that he was threatening her with, with the guns and the knives. And the fact that she thought he was a prior law enforcement. We don't know when he threatened her. We don't know how long he threatened her. We don't know if she had an opportunity. We don't know the details. Well, your honor, I, I, I, I would go back to that. This is a jury issue and there was certainly enough there for the jury to draw reasonable inferences that she was under an imminent threat. If, if you are living in a house with an abusive person who is armed, who is telling you that he is a, was a law enforcement officer and he's buddy buddy with law enforcement. How long was it imminent? How long was it imminent? The entire time he was living with her, your honor. In November, the two, the two and the two days that we have videos that the charges are based on occurred in November and then there's nothing else. And then he's arrested in January. Do we have any evidence of what kind of threat she was under imminently that entire time? Is that, is that time period relevant in terms of her not seeking any help, not going to law enforcement, not trying to protect her children? Well, it's only relevant in the sense that the government used her purported interaction with law enforcement in December, but really the, you know, the, the abuse that was proven was in November. So that would be the relevant time period as far as whether she was under a threat, but, but I, she was also under a threat not to turn him in. So the circumstances strongly suggest to me that she was under an imminent threat that entire time until he was out of the house. And even then, when she spoke to him on the phone, when he was in jail, he told her, I'm going to get out at arraignment. So I'll be out. So she was still under duress. She also, he also told her to get rid of the videos and she did on her own phone. She deleted those the night before the night before she was arrested. Well, I think an important point to keep in mind is that, and if you look back at the timing which I think we've both briefed in, in our statement of facts, is that she did not wipe her phone until after she talked, she requested the interview with Wagner and then Kurt. And they were not, did not seem at all concerned about the threat that she had been under and the duress that she had been under. And it was only after that she tried to, you know, she wanted to cooperate, but the officers did not care about the threats that she was under. And so it was only after that that she deleted the phone. Excuse me. You're speaking as though duress is a fact. It's established. That's something the jury rejected. She had a shot and they said, we've looked at all of the evidence. We've heard everything that you wanted to provide to us by argument or otherwise, and no sale. Well, your honor, respectfully, they rejected it in the face of all of these improper tactics that the government used, the improper hearsay, the improper opinion, the improper arguments. So we don't know what they would have done in the absence of those improprieties. And I see my time is over. Thank you. Okay. Thank you, counsel. Ms. Williams. Morning, your honors. Lisa Williams representing the United States of America. I'm happy to address any of the specific evidentiary issues or the standard of review. It's kind of calm. Some issues we believe are plain error. Well, actually the government's position is that it all should be plain error review, but perhaps some are abuse of discretion. But under either standard of review that this court applies, part of the analysis will either be a harmless error analysis, which the government bears the burden of, or an effect on substantial rights, which the defendant would bear the burden on. But in any event, this court is going to have to step back and say, even if there was error, did it impact, did it affect the outcome of the verdict in this case? The government's position is it absolutely did not. Before you get there, let's do talk about some of these errors because some of them are problematic for me, at least. I think one that really stands out is the government's prosecutor's closing argument where he, he, she, I'm not sure who the prosecutor was below, says to the jury, methamphetamine users binge and binge, and then they crash. And when they crash, they sleep. And sometimes they sleep for days. And he's, the prosecutor is saying these things so that he can basically minimize the evidence of duress. Essentially, why, if, if he was a meth, if he was a meth user, then why couldn't she have had days and days where she would not have been under imminent threat because he was crashed out? And so she could have done something. She could have went somewhere. And then you had even more than that. But let me, but let me stop with that right there. There were no facts in the record whatsoever, none to support that he, you know, would binge and binge and then crash and then sleep for days. None. There apparently were facts that he was a meth user. So how was that a proper statement by the prosecutor? That's correct, Your Honor. The government's argument is that it's a reasonable inference that it could draw. There is no evidence about the effect. There is none. And is that really a reasonable inference that for days and days he would binge? He's a meth user. That's all we know. It's not a reasonable inference. And then more than that, the prosecutor instructs the jury, what did Smith do to alert authorities or get help and call for distress during the days that you can think about Mr. Bias's methamphetamine usage? And you can consider whether he was crashed for hours, if not days at a time. And she did nothing because this is the life she wanted to embrace. This was in the rebuttal closing argument. We took facts that were not even slightly before the jury. And regardless of whether it needed to or not, if the evidence of duress wasn't that great, just shoved them down the jury's throat by saying, you can consider these facts I'm telling you, even though they're not in the record. I realize the judge is telling you that my statements aren't evidence, but I'm telling you, you can consider all the crashes and the binges. And why didn't she do something during that? That's pretty egregious. That's pretty egregious. And I'd like you to address why, if the only issue is duress, because that's the only issue at this point. We've got video. Nobody's contesting that. Why, with the government shoving it down their throats like that, was that not a problem? Well, because it's cumulative, Your Honor. That would be the response I would give you in looking at- There's nothing cumulative about evidence that's not in the record. Nothing cumulative about telling them to speculate about something that we don't even know happened. The evidence speaks to, as Your Honor noted, the credibility of the duress defense and whether or not she had opportunities. And there is significant other evidence in the record that speaks to the credibility of the duress defense. So the government believes it's cumulative in that sense. Yes, there's no other evidence in the record about methamphetamine users, but for the argument and the purpose underlying that evidence, or the argument that that evidence underlines, there's a lot of evidence that also speaks to that argument. So when this court gets to the third prong of plain error, let's assume it was an error and it's plain. Because we do all agree that the closing remarks are operating under plain error review because there was no objection made. So let's assume it was an error and it was plain. This court still has to evaluate whether or not there's a substantial likelihood, but for that remark, there'd be a different verdict. And again, as this court noted during counsel's prior argument a few minutes ago, could have talked to a daycare worker, could have talked to friends or family. I mean, she could have reached out at any other time to other people. So that's where I think the argument really hits the roadblock. And again, I'm not conceding it's plain error, but if this court finds that it is. Can you cite any case where a prosecutor literally made up facts about the defendant and said he was binging for days and crashed and that this, not about the defendant, but about the Mr. Smith and said that this defendant would have had time during those days when that defendant was crashed and that the jury can consider that. So, I mean, I take it that the government, even though they had presented that argument, which is what about all this other time that she could have done something? What about the daycare? What about the, you know, why was this imminent essentially? They must have been worried about it because they chose in rebuttal to really hit hard on this non-existent evidence. I would push back that the government was worried about it, Your Honor. And I think that this court sometimes, especially during rebuttal, it's not worrisome. It's frustration. It's that. May have been, but it was. So it's not that the government's worried that they're going to lose their case. It's more of a frustration that this woman is a pedophile who assault sexually abused her two and three-year-old and all of that. I'm just. She wants the jury to believe that she's under distress. And there's plenty of ways to challenge that is my point. And it was done. They challenged it properly. I'm just saying this came in and this was pretty egregious in terms of making up facts. The other thing I want to ask you about is the admission of the lay and miss lay opinion testimony from both the two agents who weren't there during her video interview, but both were allowed to testify, I believe, before the video even came in. Is that right? About her demeanor on the video. The jury hadn't seen yet. Right. Well, it was and I'm sorry, my understanding is it's her demeanor on the video during the abuse of her daughters. Well, right. It's not an interview. It's not her interview. Okay. Okay. But they hadn't had they been had they seen that video yet? The jury had not. No, your honor. So I'm sorry. I did get that mixed up. They are allowed to testify about her demeanor on a video that hadn't been admitted yet. And which they weren't present at and which the jury would see for themselves and make their own judgment. And they did see it. But what what possibly would be the basis for allowing two agents to testify about this video, which hadn't even been admitted and tell the jury what went to the heart of the defendant's duress defense, which is I don't think she appeared to be under duress in this video that, by the way, you haven't seen yet. And I wasn't there. But I'm going to tell you what I think as an agent, what could possibly be appropriate about that? Well, I think that 701 does clearly allow that type of lay opinion testimony. And in this case, what's the 701 required? A lay lay opinion based on the work witnesses, personal observations. Right. That is helpful to the trier of fact and not expert testimony. So I was personally observed about this. They watched the video just like anybody else. They did, Your Honor. But the jury hadn't seen it yet. And the difference is that they have had prior personal in-person interactions. They didn't testify to that, did they? They both made it very clear they were testifying based on what they observed on the video. Well, I read that in the defendant's reply and I pushed back. I looked at their testimony and they did very specifically. And neither one of them connected what they saw on the video, which the jury hadn't seen yet. Let's not forget that. To their work with the witness or interviews with the witness, they talked about what they saw on the video and how they perceived whether she was under duress or not. And the jury hadn't seen the video. So that's what they did. And I would assume that was let's assume that was also. Okay. Then again, assuming that's error, it still does. And if it's plain error, it's the defendant's burden. If it's harm, abuse of discretion. We did have an objection there to inappropriate comments by the witness commentary on the photos and the videos. And the counsel said those videos speak for themselves. And by the way, the videos hadn't even been admitted yet. So the jury was being told what to think about them before they were admitted. I, yes, I agree. I don't think that that was sufficient to preserve a continuing objection to the issue. Let's assume there was an objection or we can even assume it's plain error. Let's assume it was plain error. So, and I'm happy to argue harmless error too, because I think the result is the same. What the evidence is, what the improperly amended evidence is, is a few sentences of testimony where these officers are saying, she doesn't seem under duress to me, right? At the end of the day, that's what they're saying. She doesn't seem under duress. She seems like she's a willing participant in the sexual abuse. Because the jury gets to then watch the videos themselves, if the jury wasn't allowed to later see the videos, I think that that would have a more concerning effect because they can't judge the videos themselves. But the jury did get to watch the videos. They've already been told how to view them before they have a problem. Well, they're also told in the jury instructions that they're the ultimate deciders of credibility, Your Honor. And we presume that the jury follows the jury instructions. So they're told that this is their decision to make. And because of that, they get to see the videos themselves and they can make their own independent evaluation. The agent's opinion testimony isn't as weighty. I should have just disregarded it because they can make their own and they should not assume that these agents knew better than them, probably. Well, and I don't think there's a single instruction that says the agents that know better than them. Again, there's those two instructions that really say you're the ones that are, this is your job. This is what you're supposed to do. And you're the ultimate deciders of credibility. And that's, this whole trial is about that, Your Honor. This is a whole trial about, is the defendant's duress claim credible? And the jury's told that's your job. So I- Well, that's what 701 is about, is the whole purpose of 701 is to help to understand, you know, testimony. I mean, to say it's, the idea is, you know, is this person any better suited than the jury to make these determinations? And here, how are they better suited than the jury to make these determinations about a video that obviously they weren't present for, and the jury hasn't even seen? How could they possibly be better suited? And the whole idea is to prevent opinions that tell the jury what to do, essentially, or what decision to reach. And this is what, the only decision they had to reach was whether there was duress here. And these two agents told them she was not under duress. And you will see that when you see the video. Well, they said, in my opinion, right? She's not under duress, which is a fine line to slice. But I do think it's worth noting that it was their opinion. But, you know, I would refer the court back to the Chiquito case, which to me is even more egregious than what happened in this case. It's totally different because there, the agent was there during the video, during the interview. Well, the agent conducted the video. That's a big difference to be there. Yeah. And to be present during the interview and be talking about what you observed. But at the same, at the same time. There's a big difference there. Yeah. I agree there's a difference around it, but at the same time, the agent testified she wasn't lying, which I also think is a big difference than what we have in this case. You know, to say a witness isn't lying, red bells should go off to everybody in the courtroom. This witness is talking about the credibility of another witness. And that's huge. That's what we don't do. But it was fine in Chiquito. And again, I agree that there is no direct loop in the testimony where the agents are basing this opinion on their prior in-person interactions. But that doesn't mean that they didn't have that prior in-person interaction to base their opinion on. And the jury did know that they did have that prior in-person interaction because they talked about the interviews they conducted with the defendant personally. And I think so. So it's not quite to the Chiquito facts, but it's also maybe halfway there. There is some sort of in-person relationship that the agents can base some of their opinion on instead of just reading off of a cold interview video. But in this case, running out of time, again, the government would come back to, even if there are errors, plain or abuse of discretion, that did not impact the jury's verdict. The evidence was overwhelming. And the lack of evidence regarding her duress is just blatantly obvious on this record. And so even if these didn't exist, the jury still would have convicted and therefore a reversal is not required. Thank you. Thank you, counsel. Your honors, may I respond and very briefly in a minute or less? Yes. Had you run out of any time for rebuttal? Yes, I had. I intended to reserve some, but I- Okay. Take two minutes. Thank you, your honors. I believe the prosecutor's tactics here, the links they went to, to try to implant their theory into the jury's mind that she wasn't under duress, shows that they were in fact worried. And all of the circumstances here suggest a duress. My client had never done anything like this before. This was not remotely anything she was The co-defendant had been doing this for a long time. The circumstances suggest that he basically ensnared her, moved into her house and began threatening her to do what she wanted. So I would ask the court to keep that in mind. She was not predisposed to do this. She is not a pedophile. She was made to do this. And the jury should have the opportunity or another jury should have the opportunity to view this case without the improper tactics employed by the prosecution. All right. Thank you both, counsel, for your helpful arguments. The case is submitted and counsel are excused.